# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**JEREMY EVAN KINNEY,**

   **Plaintiff,**

**v.**            **Case No.: 2:14-cv-13626**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

   **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 12, 13, 14).

The undersigned has thoroughly considered the evidence, the applicable law, and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS**

1

that Plaintiff's motion for judgment on the pleadings be **GRANTED**; the Commissioner's motion for judgment on the pleadings be **DENIED**; the final decision of the Commissioner be **REVERSED;** this matter be **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and this action be **DISMISSED, with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

On February 22, 2011, Plaintiff, Jeremy Evan Kinney ("Claimant"), filed applications for DIB and SSI, alleging a disability onset date of September 23, 2010, (Tr. at 170, 175), due to "back; migraines; nerve damage; ptsd [post-traumatic stress disorder]." (Tr. at 199). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 77-87, 88-98, 103). Claimant filed a request for an administrative hearing, (Tr. at 117), which was held on December 10, 2012, before the Honorable Jack Penca, Administrative Law Judge ("ALJ"). (Tr. at 26-49). By written decision dated December 20, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-21). The ALJ's decision became the final decision of the Commissioner on January 30, 2014, when the Appeals Council denied Claimant's request for review. (Tr. 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 12), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 13), to which Claimant replied. (ECF No. 14). Consequently, the matter is fully briefed and ready for resolution.

## II.    **Claimant's Background**

Claimant was 39 years old at the time he filed the instant applications for benefits, and 41 years old on the date of the ALJ's decision. (Tr. at 31, 207). He completed a Bachelor's Degree in criminal studies and communicates in English. (Tr. at 32, 198).  Claimant served four years in the Army and then worked as a janitor, security guard, security supervisor, and stock clerk. (Tr. at 200).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d),

3

416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings.

Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2013. (Tr. at 14, Finding

No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since September 23, 2010, the alleged disability onset date. (Tr. at 14, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "headaches; back and shoulder impairment; and gout." (Tr. at 14-16, Finding No. 3). The ALJ considered Claimant's additional alleged impairments of thyroid disease, hypertension, post-traumatic stress disorder ("PTSD"), and generalized anxiety disorder. (Tr. at 14-16). However, the ALJ found these alleged impairments to be non-severe. (*Id.*).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 16-17 Finding No. 4). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform  medium work as defined in 20 CFR 404.1567(c)and 416.967(c) except he could never climb ladders, ropes, or scaffolds, and must avoid concentrated exposure to hazards. He would be limited to employment in a position requiring no more than routine, repetitive tasks.

(Tr. at 17-19, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 19, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 19-20, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1971 and was defined as a younger individual age 18-49; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that the Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 19,

Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, (Tr. at 19-20, Finding No. 10); including work in medium, unskilled occupations, such as assembler; cleaner; or laundry worker. (Tr. at 20). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 20-21, Finding No. 11).

## IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant raises one challenge to the Commissioner's decision. (ECF No. 12 at 11). He alleges that the ALJ and Appeals Council failed to give proper weight to a disability rating decision issued by the Department of Veterans Affairs ("VA"); accordingly, the Commissioner's decision was not supported by substantial evidence. Claimant points out that the VA awarded him a 90% combined disability rating with a 70% disability rating based upon his PTSD. Despite this finding, the ALJ determined that Claimant's PTSD was a non-severe impairment. According to Claimant, the ALJ should have given the VA's disability ratings substantial weight, as required by Fourth Circuit law. In the alternative, the ALJ should have explained his rationale for assigning less than substantial weight to the disability ratings, demonstrating specific evidence in the record that clearly justified a deviation from the substantial weight presumption. Additionally, Claimant maintains that after the ALJ's written decision was issued, Claimant provided the Appeals Council with the March 13, 2012 Rating Decision issued by the VA, as further proof of his disability. (*Id.* at 1-2). Claimant contends that this new and material evidence should have resulted in the Appeals Council remanding his applications so the ALJ could properly weigh the Rating Decision and explain the basis for the weight given. (*Id.*at 14).

In response, the Commissioner argues that the ALJ discussed at length Claimant's service-connected disability ratings; therefore, the ALJ met his obligation under Social Security regulations and rulings. The Commissioner alleges that the record before the ALJ offered substantial evidence supporting his finding of non-disability. (Tr. at 13 at 3). In the Commissioner's view, the ALJ expressly weighed the VA's findings and found that Claimant's conditions did not meet the standards for disability promulgated by the SSA. Thus, the ALJ explained his rationale for giving minimal weight to the VA's Rating Decision. (*Id.* at 3-4). With respect to the Appeals Council, the Commissioner points out that the ALJ knew of Claimant's VA disability rating at the time of the administrative hearing and took it into consideration. Therefore, the evidence supplied to the Appeals Council was neither new, nor likely to change the ALJ's decision. (*Id.* at 6).

## V.   __Relevant Medical Evidence__

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows:

### A.   Mental Health Treatment Records—Veterans Administration Medical Center ("VAMC")

On August 19, 2010, Claimant presented to the Veterans Administration Medical Center for treatment related to PTSD and adjustment disorder with mixed anxiety and depressive mood. (Tr. at 725). Katherine Lynch, M.A., noted that Claimant was seen in 2008 for evaluation and individual counseling and had participated in regular counseling sessions since that time. (*Id.*). She indicated that Claimant had been to a Social Security disability hearing the day prior and was anxious about the outcome. He

also expressed some apprehension over a parents' meeting at his son's school, which was scheduled the following week.

Ms. Lynch examined Claimant and found him to be alert, oriented, and cooperative. He exhibited normal speech flow, rate, and pattern. His mood was anxious with congruent affect, but he showed no evidence of psychotic thought process or significant cognitive dysfunction. (Tr. at 725-726). Ms. Lynch focused the session on Claimant's anxiety, providing him with tools to manage his feelings so that he could attend the parents' meeting. (Tr. at 726). Claimant agreed to practice tolerating unpleasant, uncomfortable situations for short periods of time to increase his endurance to anxiety-producing events. (*Id.*).

Claimant returned for counseling with Ms. Lynch on September 20, 2010. (Tr. at 713). Claimant's mental status examination remained unchanged from his prior visit. He exhibited continued avoidance of his PTSD symptoms. Claimant reported that he had gone out in public a few times; however, only at times when there was less likelihood of encountering a lot of people. Claimant reported that his irritability had not been well controlled; specifically, he was displeased with how his son was being taught at school. Claimant was told to continue with psychotherapy. (Tr. at 714).

On November 29, 2010, Claimant presented for follow-up with Ms. Lynch. (Tr. at 698-699). He reported that the SSA had denied his claim, but he intended to appeal. He worried about finances, and he remained isolated a majority of the time. However, Claimant stated that his son was doing well in school and his parental concerns had subsided. Claimant's mental status examination revealed that he was alert, oriented, and cooperative. His speech was normal in rate, pattern, and flow, and he showed no signs of psychotic thoughts or significant cognitive dysfunction. Claimant reported using

activities, like sketching and painting, to reduce his anxiety. (Tr. at 699).

Claimant returned for counseling on January 1, 2011 and was noted to be more depressed. (Tr. at 686).  He attributed this to a variety of reasons; including, the time of year, the cold weather, his lack of income and employment, and being out of pain medication.  Claimant's mental status examination was unchanged. After some discussion about the reasons underlying his increased depression in the winter, Claimant and Ms. Lynch talked about ways for Claimant to meet his needs to be productive and to find ways to save cash. Claimant's mood appeared to be improved by the end of the session. (*Id.*).

Safiullah Syed, M.D., a VAMC psychiatrist, performed an PTSD evaluation of Claimant on February 5, 2011 for purposes of compensation and pension rating. (Tr. at 409). Dr. Syed was asked to give an opinion as to whether Claimant's alleged psychological symptoms were related to his military duties. Dr. Syed reviewed Claimant's records and confirmed that he was in active service from 1990 to 1994. Claimant had already been given a 10% disability rating for migraine headaches, 10% for degenerative arthritis of the spine, and 10% for conjunctivitis. Dr. Syed noted that Claimant was alleging PTSD related to combat, and also noted that Claimant had received a number of ribbons and badges during his service in Operation Desert Storm. (*Id.*).

When asked about stressors related to his time in the military, Claimant described one instance in which a truck presumably loaded with smuggled weapons was destroyed by missile fire. He and about a dozen other soldiers had to clear bodies from the truck, and they found three children among the dead. (*Id.*). Claimant also related having to care for prisoners and watch them fight for food because they were starving.

He talked about the constant sirens he heard when stationed in Saudi Arabia, and the soldiers' fear that they would be subjected to chemical warfare. Claimant also told a story of how he was nearly killed by friendly fire, but was fortunate that one of the U.S. soldiers waiting to ambush the enemy was looking through night vision glasses and saw that Claimant was carrying an American weapon. (Tr. at 409-410). Claimant indicated that these experiences had plagued him ever since his return from war in the Middle East. (Tr. at 410).

A review of Claimant's past medical history revealed diagnoses of hypertension, gout, migraine headaches, low back pain, kidney stones, and chorea.[1] (Tr. at 410). In 2008, Claimant was diagnosed with PTSD and adjustment disorder with mixed anxiety and depressed mood after testing positive on a PTSD screen. (*Id.*). He received regular counseling, but was not on any psychotropic medication to treat the effects of PTSD. When asked to describe his current symptoms, Claimant stated that he never needed psychological treatment until he returned from the Middle East. Once he got home, Claimant found it difficult to get along with his family and friends. He was angry and moody. Claimant described having dreams and nightmares related to his military service and stated that he had even unintentionally beaten his wife in his sleep. (*Id.*). Claimant indicated that he often woke up in the middle of the night, screaming, scared, and sweating. Consequently, he rarely got more than three to four hours of sleep at night. Claimant stated that his restless sleeping habits caused him to start spending the night in a chair so that he would not disturb or hurt his wife. (Tr. at 411). Claimant reported that thoughts about finding the children's bodies surfaced more frequently

---

[1] Chorea is a name given to unpredictable, uncontrollable, jerky body movements that have no purpose. There are a variety of causes for chorea. *See Medline Plus,* U.S. National Library of Medicine, National Institutes of Health, U.S. Department of Health and Human Services (updated May 2015).

since his son's birth. He avoided watching any television discussing war and was hypervigilant with people and sounds. He expressed difficulty in dealing with the sound of helicopters and firecrackers, stating that he became anxious and nervous. He also avoided being around other people. (*Id.*).

Dr. Syed recorded Claimant's work, personal, and social history, noting that Claimant had a college degree in criminal studies. (Tr. at 411). He was married in 2000 and currently lived with his wife, mother-in-law, and four-year-old son. Claimant last worked in security at a coal mine. Claimant described his daily activities as spending time at home, mostly on the computer playing on-line games. (Tr. at 412). He had a friend that he talked to on the phone, but otherwise he did not do much. Nonetheless, Claimant was independent in activities of daily living and could drive short distances. On examination, Claimant exhibited appropriate behavior and normal speech, with coherent and linear thought process. Claimant demonstrated some problems in concentration; however, his memory was intact. Claimant reported that his mood was seven on a ten-point scale with one being depressed and ten being very happy. His anxiety was self-reported as an eight on a ten-point scale with one being calm and ten being high anxiety. (*Id.*). Claimant's insight and judgment were assessed as "fairly intact." (Tr. at 412). Dr. Syed diagnosed Claimant with PTSD and gave him a Global Assessment of Functioning ("GAF") score of 60.[2] Dr. Syed explained that although

---

[2] The Global Assessment of Functioning Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders ("DSM")*, Americ. Psych. Assoc., 32 (4th Ed. 2002) ("DSM-IV"). In the past, this tool was regularly used by mental health professionals; however, in the latest edition of the DSM, DSM-5, the GAF scale was abandoned in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. In any event, GAF scores between 51 and 60 indicated "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

Claimant was not directly involved in combat, he witnessed the aftermath of a missile attack involving children; nearly walked into a friendly-fire ambush; and lived on edge of being a victim of chemical warfare. Dr. Syed described Claimant's irritability, avoidance behavior, anxiety, and social withdrawal. He opined that Claimant suffered moderate symptoms of PTSD related to his military service and would probably benefit from medication in addition to counseling. (Tr. at 413).

Claimant returned for counseling with Katherine Lynch on February 22, 2011. (Tr. at 386). At this time, he reported fatigue due to family illness, longstanding sleep disruption, and frustration over not being able to work. However, his mental status examination was unchanged. (*Id.*). Claimant and Ms. Lynch discussed Claimant's tendency to dwell on the events that occurred during Desert Storm and reviewed methods for coping with his situation and moving forward. (Tr. at 387). He was advised to continue with individual counseling. (Tr. at 387).

Claimant returned for counseling on May 16, 2011. (Tr. at 354-355). At this session, Claimant reported an increase in depression with irritability, less motivation, and less sleep than normal. Ms. Lynch documented that Claimant's presentation was "markedly different than in other sessions." (Tr. at 355). Claimant expressed frustration over the VA's and SSA's slow processing of his claims for disability. He also stated that his inability to work was a significant stressor, although he and his wife had adjusted to their poor finances. On examination, Claimant was alert, oriented, and cooperative, with normal speech. His mood was anxious and depressed with congruent affect, but without evidence of significant cognitive dysfunction or psychotic thought processes. Claimant told Ms. Lynch that his problems with crowds had lately increased, as had his irritability. He was upset that he was turning 40, yet his body was functioning at a much

13

older age. Ms. Lynch opined that Claimant was grieving the loss of his goals and expectations for this stage of his life. She noted that Claimant was not taking any psychotropic medication, although he agreed to add medication to his treatment program. (Tr. at 355). Accordingly, Ms. Lynch arranged an appointment for Claimant to discuss psychotropic medications. (*Id.*).

On June 2, 2011, Claimant was seen by Debra Dees, Certified Physician's Assistant ("PA-C"), for assessment of mental health medication management. (Tr. at 351-54). PA-C Dees documented Claimant's presenting symptoms as difficulty being around other people, isolationism, anxiety, decreased appetite, financial stress, nightmares and other sleep disorders, difficulty trusting others, hypervigilance, avoidance behavior, decreased motivation and energy, and intrusive thoughts. His diagnoses included PTSD related to Desert Storm, general anxiety disorder, and major depressive disorder, mild. His most recent GAF score of 45.[3] PA-C Dees noted that Claimant had never taken medications for these issues. (Tr. at 352). On examination, Claimant's mood was anxious and depressed with congruent affect. His speech was clear and goal directed. He made good eye contact during the examination, demonstrating good judgment and insight. His cognition and memory were intact. Claimant was assessed with PTSD and depression and was given a GAF score of 45. (Tr. at 353). Claimant was prescribed Venlafaxine in addition to Hydroxyzine for treatment of anxiety. He was advised to continue counseling with Ms. Lynch and to return for a medication check in two months. (Tr. at 354).

Claimant next saw Ms. Lynch on June 22, 2011. (Tr. at 349-50). Claimant

---

[3] A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). On the GAF scale, a higher score indicates a less severe impairment.

appeared sluggish with slow movement. He reported poor sleep and stated that he was slowly acclimating to the antidepressant medications. Claimant felt less irritable; however, his wife was present at the session, and she reported seeing little change. She continued to wait for the medications to make a difference in Claimant's ability to be in public and interact with others. (Tr. at 350). Claimant's mental status examination was essentially the same, reflecting a depressed and anxious mood and affect. Ms. Lynch recorded that the session was not particularly fruitful, as both Claimant and his wife were unable to focus and concentrate well "due to their respective ailments." (*Id.*). Ms. Lynch suggested that Claimant and his wife plan events to do with their son over the summer and urged Claimant to try interaction with others while using cognitive restructuring.

Claimant returned for counseling on July 25, 2011. (Tr. at 345-46). He reported that he felt some better with the prescribed medication, although Claimant's wife was not convinced the medications were "a good fit" or were beneficial. Claimant still struggled with being in public; especially, since the weather had become hot. Claimant indicated that the heat was a trigger for his PTSD. His sleep disturbances were more pronounced, as well. (Tr. at 346). On examination, Claimant was alert and oriented with a normal speech rate, pattern, and flow. His mood and affect were anxious and depressed, but without evidence of psychotic thought process or significant cognitive dysfunction. In discussing his medication, Claimant indicated that he had not been able to increase the dosages due to feelings of numbness and lethargy. (Tr. at 346). Ms. Lynch suggested more intensive PTSD treatment, which Claimant agreed to consider. (Tr. at 347).

On August 4, 2011, Claimant met with Debra Dees, PA-C for medication

management. (Tr. at 336). He explained that the Venlafaxine was causing side effects, and he wanted to change that medication. However, Claimant felt the Hydroxyzine prescription was working without any ill effects. Claimant reported a small increase in energy and motivation, but continued to have sleep disturbances. Claimant had ventured out in public to take his son to Chuck E. Cheese, and he was planning on attending his wife's family reunion. Claimant rated his depression as four out of ten, although he continued to experience episodes of avolition and anhedonia. (*Id.*). Claimant also complained of daily PTSD symptoms, reporting that he preferred to be alone and isolated. (Tr. at 337). He avoided crowds and was hypervigilant, having feelings of constant, uncontrolled worry. Claimant also described experiencing a sense of impending doom. He was irritable and had flashbacks, muscle tension, and trouble concentrating. On examination, Claimant was in a quiet mood and appeared depressed. However, his speech was clear and goal directed, and his eye contact was good. Claimant was assessed with PTSD, depression, and generalized anxiety disorder. He was given a GAF score of 45. (Tr. at 338). Claimant was advised to continue Hydroxyzine 10 mg, to discontinue Venlafaxine, and to begin Buproprion. (Tr. at 338-339).

Claimant returned for counseling session with Ms. Lynch on September 16, 2011. (Tr. at 319-20). Claimant complained of fatigue, sleep disruption, continued isolation, and hypervigilance. His wife reported that Claimant had nightmares four to five times each week that involved yelling and thrashing. (Tr. at 320). Claimant could not recall the nightmares. Claimant's mental status examination was at baseline, with the predominant findings being depressed and anxious mood and affect. Claimant spent the session recounting his experiences in the military. Ms. Lynch planned to discuss how these experiences impacted and changed him at the next session.

On September 30, 2011, Dr. Syed performed a review PTSD examination. He documented that Claimant was currently rated at 30% disability for PTSD, 10% disability for hand and feet chorea, 10% disability for degenerative arthritis of the spine, 10% disability for conjunctivitis, and 10% disability for migraine headaches. (Tr. at 405-06). The purpose of the examination was to determine whether Claimant was entitled to an increase in his PTSD disability rating. Claimant reported that he continued to have problems related to PTSD and received regular treatment at the VAMC's mental health clinic. He was taking Citalopram 40 mg daily for his PTSD symptoms and depression, as well as Hydroxyzine 10 mg four times a day for his anxiety. Claimant had recently stopped taking Bupropion because it made him irritable. (Tr. at 406). Dr. Syed noted that Claimant had not been hospitalized for his psychiatric conditions, but was regular with outpatient counseling sessions.

When asked his symptoms, Claimant described dwelling on his past war experiences, stating that the smell of burning meat triggered his memories, as did taking his child out of his car seat. Claimant avoided television programs about war, unless they involved World War I or World War II, and he continued to have problems being around people, feeling edgy and short of breath in crowds. Claimant stated that he only went shopping at night when he did not have to be around many people. His wife reported that Claimant was depressed and was "a hermit," rarely going out. (*Id.*). Both Claimant and his wife verified that he continued to have sleep disturbances, including nightmares, and for this reason, they no longer slept in the same bed.

On examination, Claimant was calm although he made fleeting eye contact and demonstrated low volume and tone of speech. His thought process was coherent with no delusions or auditory hallucinations; however, he did remark that he saw shadows in his

17

peripheral vision at times. (Tr. at 407). Dr. Syed estimated that Claimant was of low average intellectual functioning, but did demonstrate fairly intact insight and judgment. (*Id.*). Based upon his examination findings, Dr. Syed opined that Claimant continued to suffer from PTSD symptoms and depression and was "not doing well." (Tr. at 408). He gave Claimant a GAF score of 50-55[4] to reflect his moderate to serious impairment in social and occupational functioning. (*Id.*).

PA-C Dees conducted a medication management assessment of Claimant on October 5, 2011. (Tr. at 310-11). Claimant stated that the medication was not improving his symptoms. He continued having disrupted sleep, nightmares, crowd avoidance, hypervigilance, and flashbacks. On examination, Claimant's mood and affect were documented as dysphoric, but he exhibited clear, concise speech with no delusional or psychotic thought process. (Tr. at 312). He was advised to continue taking the same medications and follow up in one month. (*Id.*).

Claimant returned to PA-C Dees on December 1, 2011, this time complaining of side effects from Citalopram. (Tr. at 773). He continued to have sleep disturbances, including nightmares severe enough to trigger panic attacks. Claimant also reported low energy and motivation. Claimant's wife stated that his PTSD symptoms had gotten worse since the deaths of his father, grandfather, and best friend. She indicated that Claimant primarily played games online with out-of-state acquaintances, had no civic or church affiliations, and rarely left the house. (Tr. at 773-74). Claimant explained that his symptoms intensified as he approached Christmas and New Year's Day because these were the times of year when the bad experiences occurred overseas. He had recently

---

[4] GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

been experiencing more flashbacks triggered by gunshots he heard in the woods around his house. (Tr. at 774). Claimant became hypervigilant, checking the doors, windows, and perimeter of the house. He kept five dogs to provide extra security. Claimant stated that he worried excessively and had trouble controlling his worry. He felt restless, edgy, irritable, and tense.

On examination, Claimant appeared slightly disheveled and exhibited a quiet mood and affect. Still, his thoughts and responses were appropriate and he expressed them with clear, goal directed speech. Claimant also made good eye contact. Claimant was assessed with PTSD and depression and was given a GAF score of 50. (Tr. at 775). PA-C Dees decided to prescribe trial doses of Sertraline and Trazodone to accompany the prescription of Hydroxyzine. She recommended that he continue regular counseling sessions and return on January 10, 2012 for assessment. (*Id.*).

Claimant's next counseling session was also on January 10, 2012. (Tr. at 764-66). On this visit, Ms. Lynch noted that Claimant's demeanor and appearance seemed greatly improved since the last session, although he felt his symptoms were unchanged. (Tr. at 765). Claimant continued to have depression and nightmares with violent actions, including punching a hole in the wall. On the other hand, Claimant described having a nice Christmas with his son, stating that they had enjoyed a light show in the park. Claimant had developed some problems with his wife's nephew, whom Claimant suspected was sneaking around his property at night. Both Claimant and his wife were suspicious of the nephew and were vigilant. Ms. Lynch allowed Claimant to discuss in detail one particular event that occurred while he was in the military, helping him process his thoughts and emotions. She felt the session was productive. (Tr. at 765).

That same day, Claimant presented to PA-C Dees. (Tr. at 768). He complained

that the medication he took during the day caused color disturbances in his peripheral vision, and the evening medication caused him to sleep 18-20 hours at a time. Claimant continued to have nightmares with violent actions, severe panic attacks, and hives. He also reported low energy, increased fear of crowds, isolation, flashbacks, and hypervigilance. (*Id.*). Claimant was assessed with an exacerbation of PTSD symptoms brought on by family problems and the anniversaries of the traumatic events. He was advised to discontinue Sertraline and Trazodone and was prescribed Duloxetine and Imipramine. PA-C Dees told Claimant to continue with counseling and to return for a medication assessment in seven weeks. (Tr. at 770).

On April 20, 2012, Claimant returned to Ms. Lynch for counseling. (Tr. at 757-59). He reported a worsening of his PTSD symptoms. He told Ms. Lynch he had attempted being in public and having social interactions; however, the attempts were unsuccessful. Recently, he had attended a birthday party, and his symptoms were triggered when food was grilled. Ms. Lynch discussed with Claimant the episode in Desert Storm when he and other soldiers came upon the vehicle that had been destroyed by a missile. Claimant explained how this event impacted his life. Ms. Lynch felt the counseling session was very productive, noting that Claimant was engaging differently and was more connected than he had been in quite a while. (Tr. at 758).

Following his session with Ms. Lynch, Claimant presented to PA-C Dees. (Tr. at 761). He told her that his medications were working without negative side effects. He continued to complain of sleep issues with nightmares, but felt a slight improvement in energy and motivation. Claimant's PTSD symptoms had not abated, however, with flashbacks, emotional detachment, avoidance of others, excessive worry and hypervigilance. (*Id.*). PA-C Dees noted that Claimant had a euthymic mood and affect,

maintained good eye contact, and spoke clearly with appropriate thoughts and responses. (Tr. at 762). He was given a GAF score of 50. (Tr. at 763). Claimant was assessed as stable on medication.

On July 25, 2012, Claimant returned to PA-C Dees. Claimant reported he was doing well on his medications with no ill effects. (Tr. at 755). He continued to complain of fragmented sleep with severe, vivid nightmares, low energy and motivation with worsening PTSD symptoms, but stated that he was sleeping longer hours, about 8-9 hours per night. Claimant indicated that he still felt uncomfortable around people and, as a result, he rarely left the house. He preferred isolation and solitude. In addition, Claimant complained of ongoing flashbacks, emotional detachment, hypervigilance, and excessive worry. (*Id.*). Claimant's condition was assessed as stable on medications and he was given a GAF score of 50. (*Id.*).

Claimant returned to Ms. Lynch for counseling on August 17, 2012. (Tr. at 751-53). He reported that his mother-in-law had recently died at home; however, he and his wife were coping well with making the arrangements. Unfortunately, the death created some family issues over the will and distribution of assets, and Claimant was upset about the presence of his wife's brother-in-law on Claimant's property. Ms. Lynch spent the session helping Claimant and his wife process their grief and the drama of the family dynamic. Claimant also reported that now that he no longer had to assist with the daily care of his mother-in-law, he was going more places with his wife, and this had increased his stress level. Ms. Lynch offered some methods to better cope with the stress of the outings. (Tr. at 752).

Claimant's next counseling session was on September 28, 2012. (Tr. at 749). Claimant and his wife continued to cope with grief over the death of his wife's mother.

In addition, Claimant's wife had been hospitalized recently, and her absence forced Claimant to care for their son and manage the household alone. Nonetheless, things went well, and he reported a sense of accomplishment from this experience. Claimant stated that he was attempting to go out in public more often, and he and his wife planned to take their son to the circus the following day. (*Id.*). Ms. Lynch felt that Claimant seemed to be improving, but noted that his wife had lost considerable weight and appeared to be extremely fatigued. (Tr. at 750). Ms. Lynch observed that Claimant and his wife were not as concerned about her health conditions as would be expected; particularly, as they had limited resources for medical care.

On October 25, 2012, Claimant presented to PA-C Dees. He reported increased feelings of disconnection despite having some relief with his current medications. (Tr. at 745). Claimant stated that his sleep patterns had improved; although, he continued to have severe nightmares, low energy, and low motivation. Claimant reported continued PTSD symptoms, which were more pronounced since the recent deaths of several of his family members, including feelings of isolation, excessive worry, irritability, emotional detachment, and hypervigilance. He remained socially withdrawn and avoided being around crowds, which he disliked. (Tr. at 746). Claimant was assessed as stable on medication with a GAF score of 50. (Tr. at 747). He was advised to continue the prescribed medication regimen, to continue counseling, and to return in two months. (*Id.*).

### B. Mental Health Evaluations and Opinions

On March 28, 2011, Jim Capage, Ph.D., completed a Psychiatric Review Technique form. (Tr. at 240-53). Dr. Capage indicated Claimant's impairments of affective disorder and anxiety-related disorder were non-severe. (Tr. at 240). He

classified Claimant's affective disorder as major depressive disorder, recurrent, (Tr. at 243), and his anxiety-related disorder as PTSD and generalized anxiety disorder. (Tr. at 245). With regard to functional limitations, Dr. Capage found Claimant had no limitations in activities of daily living. He was mildly limited in maintaining social functioning, concentration, persistence, and pace, and had no episodes of decompensation. (Tr. at 250). Dr. Capage likewise found no evidence of paragraph "C" criteria. (Tr. at 251). Dr. Capage opined that Claimant's allegations and symptoms were consistent with the medical records and did establish mental impairments; however, he felt that Claimant exaggerated their severity given that his alleged functional limitations were inconsistent with the record and his psychiatric treatment was conservative. Pointing to Claimant's habit of playing online games and his telephone calls with gaming friends, Dr. Capage believed that Claimant retained the mental and emotional capacity to sustain work-like activities. Dr. Capage added that Claimant was capable of managing his own medication regimen, could drive short distances, and was independent in his activities of daily living, all of which supported the conclusion that he could work. (Tr. at 252).

Elliott Rotman, Ph.D., completed a Medical Consultant's Review of Psychiatric Review Technique and Case Analysis on April 27, 2011. (Tr. at 265-67). Dr. Rotman agreed with Dr. Capage's Psychiatric Review Technique, including the categories of disorders and rating of functional limitations. (Tr. at 265-266). In his case analysis, Dr. Rotman opined that although Claimant's mental health status appeared more severe in 2008, his current mental health status appeared to be non-severe. Dr. Rotman noted that Claimant was receiving therapy for PTSD and had reported improvement over time. Dr. Rotman also cited VAMC records which rated Claimant's depression as mild, noting

that the evidence only supported a mild level of impairment at a functional level. (Tr. at 267).

Jeff Boggess, Ph.D., completed a second Case Analysis form on June 17, 2011. After reviewing the file, Dr. Boggess indicated that there were no new psychiatric allegations or medical examination reports. Therefore, he affirmed the Psychiatric Review Technique as written by Dr. Capage. (Tr. at 278).

On March 13, 2012, the VA issued a Rating Decision pertinent to Claimant's alleged disability. (Tr. at 805-06). According to the decision, VAMC treatment records from March 18, 2011 to February 27, 2012 were reviewed, as well as a few other pieces of evidence. Based on this information, the VA granted Claimant a service-connected disability rating of 70% for his PTSD for the period beginning April 8, 2011, up from a 30% rating in August 2010. In addition, Claimant's disability rating for migraine headaches was increased from 10% to 50% effective October 11, 2011. He continued to have a 10% rating for each of the following conditions: keratoconjuntivitis; action tremor of the extremities (mild); and degenerative disc disease at L5/S1. (Tr. at 806). As of October 11, 2011, Claimant had a combined disability rating of 90%. (Tr. at 807). However, the VA denied Claimant's allegation that additional impairments, including a left knee condition, hearing loss, eczema, and radiculopathy of the bilateral lower extremities, were service-connected.

## VI.   <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a
> particular conclusion. It consists of more than a mere scintilla of evidence
> but may be somewhat less than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the case before a jury, then there is
> "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

**VII.   <u>Discussion</u>**

In *Bird v. Commissioner of Soc. Sec.,* the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") discussed the role that disability decisions by other governmental agencies play in the SSA's disability determination process, stating the general rule that although these decisions are not binding on the SSA, they "cannot be ignored and must be considered" when determining a claimant's eligibility for Social Security disability benefits. *Id.,* 699 F.3d 337, 343 (4th Cir. 2012) (citing *DeLoatche v.*

*Heckler*, 715 F.2d 148, 150 n. 1 (4th Cir. 1983) and SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006)).[5] Similar to the instant action, the claimant in *Bird* was awarded disability benefits by the VA, but was found by an ALJ not to be disabled under the Social Security Act. After the district court affirmed the Commissioner's decision, the claimant argued on appeal that the ALJ had failed to afford adequate weight to the VA's Rating Decision. In considering the argument, the Fourth Circuit acknowledged that while it had not addressed the precise weight that the SSA should give to the VA's disability ratings, sister circuits had found varying degrees of deference to be appropriate. Examining the SSA's disability program and the VA's program, the Court observed that "both the VA and Social Security programs serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability." *Id.* In addition, "[b]oth programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims." *Id.* (citing *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002)). Consequently, the Court found that "because the purpose and evaluation methodology of both programs are closely related, a disability rating by one of the two agencies is highly relevant to the disability determination of the

---

[5] SSR 06-03p provides *inter alia*:

> Under sections 221 and 1633 of the Act, only a State agency or the Commissioner can make a determination based on Social Security law that you are blind or disabled. Our regulations at 20 CFR 404.1527(e) and 416.927(e) make clear that the final responsibility for deciding certain issues, such as whether you are disabled, is reserved to the Commissioner (see also SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner"). However, we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies (20 CFR 404.1512(b)(5) and 416.912(b)(5)). Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.

other agency." *Id.* Thus, the Court held:

> [I]n making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.

*Id.* Since the *Bird* decision, many courts in this circuit have concluded that a finding of nondisability by the Commissioner must be reversed and remanded when the ALJ failed to give substantial weight to a relevant VA Rating Decision, or in the alternative, failed to explain how giving the rating less weight was clearly appropriate in light of the record. *See, e.g., Williams v. Colvin,* No. 5:13-CV-571-FL, 2015 WL 73954, at *3 (E.D.N.C. Jan 6, 2015); *Wyche v. Colvin,* No. 4:13-cv-43, 2014 WL 1903106, at *8 n. 2, *10 (E.D.Va. Apr. 30, 2014) (collecting cases); *Sheldon v. Colvin,* No. 9:13-cv-0151 DCN, 2014 WL 1364984, at *4 (D.S.C. Apr. 7, 2014); *Gross v. Commissioner of Soc. Sec.,* No. WDQ-13-1274, 2014 WL 3672878, at *4 (D.Md. July 22, 2014); *Salazar v. Colvin,* No. 1:10-cv-972, 2014 WL 486726, at *6 (M.D.N.C. Feb. 6, 2014). In some instances, remand was necessary simply because the evidence was not weighed in accordance with *Bird*, and weighing the evidence was not the Court's function. Therefore, the case required remand so that the evidence could be reweighed by the ALJ using the correct evidentiary standard. *Sheldon,* 2014 WL 1364984, at *4.

In this case, the ALJ mentioned Claimant's VA disability ratings once, when discussing his RFC finding. Specifically, the ALJ stated:

> However, despite his service and his service-connected disability determined by the VA, the claimant's conditions do not meet the standards for "disability" as described by the Social Security Rulings.

(Tr. at 19). The ALJ continued the discussion by acknowledging that Claimant "suffers

from severe *physical* impairments that are significantly limiting," (*Id.*) (emphasis added), but added that "those limitations have been adequately assessed in the residual functional capacity herein." (*Id.*). Clearly, the ALJ's treatment of the VA's disability ratings did not comply with the requirements set forth in *Bird*. The ALJ never weighed the VA's rating decisions, nor pointed to clear evidence in the record that justified affording the decisions less than substantial weight. The ALJ's lack of any analysis of the VA's 70% disability rating for Claimant's PTSD was particularly notable given the ALJ's conclusion that Claimant's PTSD was a non-severe impairment. To comply with Social Security rulings and regulations, the ALJ should have fully addressed and reconciled the obvious disparity between these two key findings.

In addition, the ALJ never thoroughly discussed the PTSD evaluations performed by Dr. Syed, which were essential to the VA's disability rating, choosing instead to rely entirely upon the opinions of non-examining, non-treating agency consultants. (Tr. at 16). While the ALJ was entitled to give more weight to the opinions of the agency consultants, he should have explained why those opinions—rendered before Dr. Syed's second disability examination and without the benefit of additional treatment records considered by the VA—were more persuasive than the numerous counseling notes documenting Claimant's moderate to severe PTSD symptoms.[6] (Tr. at 805). Moreover, contrary to the Commissioner's assertion that the ALJ accounted for Claimant's PTSD

---

[6] The ALJ explained his reasoning for rejecting some of the GAF scores given to Claimant by the VAMC mental health providers, but did not discuss any of the factors typically used to weigh the opinions of medical sources. Although the ALJ was not required to address each factor, his reason for finding the consultants' opinions to be worth more weight than the opinions of the VAMC providers was vague and poorly supported. (Tr. at 16). The ALJ expressly, and briefly, discussed three counseling sessions, but ignored many others, essentially finding that Claimant's PTSD caused minimal interference with his ability to work because, in the ALJ's view, Claimant was functioning "relatively well." (*Id.*). Moreover, the ALJ misrepresented some of the counseling records, making Claimant's condition appear less severe than it appeared when viewing the notes in their entirety. For example, the ALJ indicated that Claimant was able to do more in public since his mother-in-law died; however, the ALJ failed to mention that Claimant reported experiencing increased levels of stress when making these public outings. (Tr. at 15, 752).

by limiting him to "a position requiring no more than routine, repetitive tasks," the ALJ never articulated a specific reason for this limitation. In his discussion of the RFC finding, the ALJ did not explicitly address PTSD, nor did he indicate that the limitation to routine and repetitive tasks was intended to account for Claimant's psychiatric impairments. Indeed, the written decision shows that the ALJ was focused on Claimant's *physical* impairments, and this limitation was intended to account for Claimant's deficits in concentration, persistence, and pace, which perhaps were the effects of Claimant's migraines and pain symptoms, rather than his PTSD. A review of Claimant's treatment records reveals that his primary PTSD symptoms included ongoing flashbacks, nightmares, and other sleep-related difficulties; hypervigilance; social isolation; and anxiety and distress when in public places. A limitation to routine, repetitive tasks is plainly inadequate to fully address the expected functional limitations associated with these varied symptoms. Given the ALJ's failure to analyze, weigh, and discuss the VA's PTSD disability rating, the undersigned is unable to conclude that his decision was supported by substantial evidence.

Furthermore, the Appeals Council erred by failing to remand the matter and instruct the ALJ to properly consider and weigh the VA's Rating Decision. On judicial review, a court may remand the Commissioner's decision for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand is appropriate when the Commissioner's decision is not supported by substantial evidence, the Commissioner incorrectly applies the law when reaching the decision, or the basis of the Commissioner's decision is indiscernible. *Brown v. Astrue,* Case No. 8:11–03151–RBH–JDA, 2013 WL 625599 (D.S.C. Jan. 31, 2013) (citations omitted). If new and material evidence is submitted after the ALJ's decision, the Appeals Council:

> shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R 404.970(b). When the Appeals Council incorporates new and material evidence into the administrative record, and nevertheless denies review of the ALJ's findings and conclusions, the issue before the court is whether the Commissioner's decision is supported by substantial evidence in light of "the record as a whole including any new evidence that the Appeals Council specifically incorporated into the administrative record." *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (remanding for rehearing pursuant to sentence four of 42 U.S.C. § 405(g)) (quoting *Wilkins v. Sec'y, Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (internal marks omitted)). If the ALJ's decision is flawed for any of the reasons stated, the court may remand the matter for a rehearing under sentence four.[7]

By incorporating the VA's Rating Decision into the record and considering it as additional evidence, the Appeals Council conceded that the Rating Decision was new, material, and relevant to the disability decision at issue. *See Gentry v. Colvin,* No. 2:13-CV-66-FL, 2015 WL 1456131, at *2-3 (E.D.N.C. Mar. 30, 2015); *Smith v. Colvin,* C/A No.: 1:14-cv-0489 DCN, 2015 WL 1263040, at *18 (D.S.C. Mar. 18. 2015). Thus, the only question for the Court is whether the ALJ's decision is supported by substantial evidence in view of the record, as supplemented with the new, material, and relevant evidence considered by the Appeals Council. The Commissioner argues that remand is

---

[7] Sentence four allows the court to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

unnecessary in this case because the information contained in the Rating Decision was already in the record and before the ALJ. As such, the ALJ considered the VA's disability ratings and still found that Claimant was not disabled under the Social Security Act. The problem with the Commissioner's logic, however, is that the ALJ did not apply the correct legal standard in his assessment of the VA's disability ratings. In order for the Commissioner's decision to be supported by substantial evidence, it must have been reached through a correct application of the law. The use of an erroneous legal standard in the disability determination process generally requires remand unless the error is harmless. Here, if the ALJ had given the VA's Rating Decision substantial weight, then Claimant's PTSD would, at the very minimum, have been recognized as a severe impairment, and could have been seen as a disabling condition. Furthermore, in view of the ALJ's focus on Claimant's severe physical limitations in his RFC finding, to the apparent exclusion of the non-severe mental impairments, acknowledging Claimant's PTSD as a severe impairment likely would have led the ALJ to amend or modify the RFC finding to better accommodate the functional limitations related to Claimant's PTSD. Consequently, applying the appropriate evidentiary standard to the VA's Rating Decision could reasonably have changed the outcome of the case. *See Bratton v. Colvin,* Civil Action No. 7:13cv00421, 2015 WL 1275181, at *6 (Mar. 19, 2015) ("Courts ... review[] the record as a whole to determine if the new evidence is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports. If the new evidence creates ... a conflict, there is a reasonable possibility that it would change the outcome of the case, and the case must be remanded to the Commissioner to weigh and resolve the conflicting evidence."). Thus, failing to apply the correct standard was not harmless error.

Therefore, the undersigned **FINDS** that the ALJ and the Appeals Council erred in their treatment of the VA's Rating Decision, and as a result, the Commissioner's decision is not supported by substantial evidence. Accordingly, this matter should be remanded to allow the Commissioner to reconcile the inconsistencies in the record; to properly weigh the VA's Rating Decision and amend the RFC finding, if appropriate; and to determine, with the help of a vocational expert, whether there are jobs available in sufficient numbers in the national economy that Claimant is capable of performing despite his particular limitations. *See Smith v. Colvin,* Civil Action No. 9:14-cv-219-MGL, 2015 WL 1897614, at *7 (Apr. 14, 2014).

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **REVERSE** the final decision of the Commissioner; **REMAND** this matter under sentence four of 42 U.S.C. § 405(g) for further administrative proceedings pursuant to *Bird v. Commissioner of Soc. Sec*; and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of

such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: June 12, 2015

Cheryl A. Eifert
United States Magistrate Judge

33